IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | 16 CR 462-8 |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| OSCAR ORTIZ, | ) | |
|     Defendant. | ) | |

**SENTENCING MEMORANDUM OF OSCAR ORTIZ**

NOW COMES Defendant OSCAR ORTIZ ("OSCAR"), by and through his attorney, Quinn A. Michaelis, and respectfully requests, pursuant to 18 U.S.C. § 3553(a), and *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, that this Honorable Court impose a below guideline sentence at the mandatory minimum, because such sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). In support of this request, OSCAR states as follows:

**I.  INTRODUCTION**

There was a black room in a house in Harvard, Illinois with a lock on the inside of the door. The lock was a gift from Teofil, OSCAR's grandfather; the type of request granted out of love for a child when one no longer knows how to help someone who is clearly troubled. OSCAR asked his grandfather for the lock so that he could retreat to his black room when he wasn't feeling safe, to calm the horrors he was hearing, but which had no source outside of his mind. He first started

1

hearing things around the age of five or six, and resorted to cutting himself to focus on something other than these voices. (PSR at 199, referring to self-harm scars).

 Because OSCAR could lock himself in his room and not be bothered, he also began to sneak beer and hard alcohol into his room, as early as age eight (PSR at 210). He wasn't trying to rebel, he simply wanted to calm himself, and he knew drinking to drunkenness, alone in his locked room, would do just that. One of the few "gifts" OSCAR's mother gave him was an increased predisposition for mental illness, as she suffered from anxiety and bipolar disorder herself. (PSR at 186, *see also* attached letters). She was often in and out of OSCAR's life, frequently disappearing into heroin addiction and abandoning OSCAR and his siblings for many days at a time. Sometimes OSCAR would try to take care of his siblings himself, the best way a young child could without any guidance. Sometimes he would gather his siblings up to take them to his grandparents where they would stay until his mother would reemerge, who would only abandon them again in favor of her addiction. (PSR at 189-90). As a result, OSCAR was forced into a roll of responsibility much too young, having to care for his younger brothers and sisters; feeding them, clothing them, and taking them to school. There often wasn't enough good, healthy food in the house to feed his brothers and sisters, but he would try to make do with some crackers or whatever he could find. (See Letter of Fred Moreno). When his mother was around, she would sometimes fight with OSCAR, and he would choose to sleep on the streets rather than stay around his mother when she was violent. (PSR 191).

2

On these occasions, OSCAR would sleep in the parks in Maywood, literally sleeping in the playground equipment at night to keep himself dry and relatively protected from the elements. Sometimes he would sneak into old buildings for shelter rather than staying at home with his mother. Home with his mother was never a safe place for OSCAR. He could never be sure how long his mother would stay around and when she was around, she was either violent or under the effects of a significant opioid addiction, and she would bring men into the home who were unsafe as well. Some of these men were violent towards his mother, and some were abusive towards OSCAR (PSR at 190). One of these men repeatedly sexually abused OSCAR when he was nine years old. (PSR at 190). Against this backdrop, OSCAR learned that the only safe place for him was alone, in the darkness, locked away from everyone else.

When OSCAR became a teenager and living with his uncle, he began to meet members of the Latin Kings. They were friendly to him, despite his quietness, and as he got to know them more closely, he started to feel a sense of family that he desperately needed, but was absent in his own home. (PSR at 196) The Kings offered OSCAR loyalty, protection, and brotherhood; an intoxicating mix for someone who has had no one but himself to rely on during a time when he should have been loved and protected by his family. They gave him a new name, "Thirsty"; The name itself displaying the kind of community and attention that OSCAR hadn't experienced before. OSCAR's new brothers would playfully tease him about why he was drinking so much water all the time. He didn't want to tell them it was because

3

he had diabetes, (PSR at 200), which caused his constant thirst. OSCAR would often get sick because he didn't have money to pay for his insulin, which he requires twice a day (PSR at 200). If he was staying with one of his new brothers, they'd respect his need to be alone, but soon they became worried enough about his health to ask why he was frequently ill. When they discovered why OSCAR was sick, the gang started to buy insulin for him, taking care of him in a way his mother had not.

OSCAR sacrificed dearly for the Latin Kings. OSCAR met Lissa Garcia, a woman he saw himself marrying one day. (PSR at 192). Lissa believed in OSCAR and encouraged him to improve himself. However, the relationship ended because OSCAR would not stop his involvement with the Latin Kings; and for that he lost his chance for a real family.

OSCAR has, in essence, been living in a prison of his own creation for as long as he can remember. He has had to imprison himself physically and emotionally to protect himself both from his own mind and from those who were supposed to protect him. Although his grandparents and uncle tried to provide him with stability, they simply weren't equipped to deal with the deep wounds that his genetics and his home environment inflicted on him. There is only one person in all the world who has ever made OSCAR feel truly happy: his daughter, Chloe. OSCAR and Chloe share a special connection, one made even more significant by the fact that OSCAR had no parental role model to teach him how to be a parent. Chloe is the only person who makes OSCAR feel happy, and when he lived with her they were inseparable. His desire to be around his daughter was so

4

great that, after his relationship with Chloe's mother (Lissa) ended, OSCAR would walk for hours to Lyons from where ever he happened to be staying, just to be with her. He talks to her on the phone whenever he can, and even struggles to look at the color pink, her favorite color, without feeling immense sadness. Although OSCAR has had the support from his fiancé, Katerina Rios, during his period of incarceration, OSCAR struggles most profoundly with the fact that he cannot be with his daughter, and will miss her entire childhood, just as his mother did with him.

OSCAR asks this Court to consider not just the acts relating to the racketeering conspiracy and the firearm count, but his need for mental health screening and treatment, the effect of his incarceration on his mental health, and the personal losses he suffered. A sentence within the advisory guideline range is far in excess of what is just or necessary in this case. A sentence at the mandatory minimum sentence is sufficient, but not greater than necessary to comply with the purposes of sentencing.

II. **A SENTENCE AT THE MANDATORY MINIMUM FOLLOWED BY A PERIOD OF SUPERVISED RELEASE WOULD SATIFY THE GOALS OF §3553(a).**

The Court must impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2), " which are "the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;

5

(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7).

### a. the need to afford adequate deterrence:

Research has consistently shown that certainty of punishment, not severity of punishment has a deterrent effect; "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). For individuals like OSCAR, "who were sentenced to prison for their first felony, we find no support for the deterrence hypothesis. In each matched comparison, individuals who received less severe subsequent sanctions recidivate less than did matched prison inmate groups." Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, J. of Research in Crime & Delinquency 24 (2017).

The time that OSCAR has already served in this case is the longest period of time OSCAR has ever served in custody. It is, in fact, the only real time that OSCAR has ever spent in custody. That period of time away from his family and his daughter has already had a deterrent effect on OSCAR's behavior as

demonstrated by his participation in numerous pro-social programs (See Exhibit 1, Certificates)

While in custody, OSCAR participated in and successfully completed the Resolve treatment program at the Jerome Combs Detention Center. As the attached records indicate, he participated in all aspects of treatment and developed a treatment plan to follow to address his addiction issues. According to the prognosis, OSCAR is expected to do well if he can follow his treatment plan. (See Exhibit 2, Jail Evaluation)

Additionally, while in custody, OSCAR has participated in a number of programs at Jerome Combs Detention Center. As the above social science literature demonstrates, cognitive behavioral skill-building is more effective in reducing future criminal behavior than punishment even among persons at high-risk of reoffending. Office of Justice Programs, National Institute of Justice, *Preventing Future Crime with Cognitive Behavioral Therapy*, 265 Nat'l Instit. of Just. J 22 (2010). OSCAR has clearly demonstrated his desire to take advantage of skill building programming, which will prepare him better for his life after he is released from custody, as well as provide a specific deterrent. And, as the attached letter of Fred Moreno demonstrates, OSCAR already has a role model of success for someone who built a thriving life for himself after a period of incarceration. Mr. Moreno writes, "[p]lease, I love him like a son and I would feel like I am doing time all over again. I have a place and job with me if has able to get some leniency." (See Letter of Fred Moreno.

### b. The Need to protect the public from future crimes of the defendant

Under *Rita* and *Kimbrough*, judges may consider arguments that a particular guideline fails to properly reflect §3553(a) considerations, reflects unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita v. United States*, 53 U.S. 338, 351, 357 (2007). Where a guideline was not developed based on "empirical data and national experience," it is not an abuse of discretion to conclude that the particular guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough United States*, 128 S. Ct. 558, 575 (2007).

The United States Sentencing Commission's three reports on recidivism acknowledge that the criminal history rules were never based on empirical evidence.[1] The studies identify numerous factors which predict reduced recidivism that are not included in the Guidelines and factors which do not predict recidivism that are included in the Guidelines. Among the factors noted that aid in reducing recidivism is family connections. *Measuring Recidivism,* at 12 & Exhibit 10. Fathers who maintain relationships with children are less likely to recidivate. Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Family L. Q. 191 (2006) ("The literature … suggests that ex-convicts who share close relationships with their children are less likely to recidivate than those who do not."). "The single

---

[1] USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004); USSC, *Recidivism and the First Offender* (May 2004); USSC, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 2005).

8

best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties." Id. at 196-97.

As the attached letters indicate, OSCAR's biggest strength, beyond his resilience, is the love he has for his daughter. As OSCAR's sister, Victoria, writes, "I just can't even imagine my big brother <u>to not</u> be able to help Chloe or be there for her like he was with us. Chloe is his world and Chloe loves her daddy….to be a father to Chloe ~~was~~ no I meant is the biggest/greatest part of his life." (See attached letter of Victoria Ortiz).

### c. Need for adequate treatment

The Sentencing Guidelines recognize that mental and emotional conditions "may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.3. Furthermore, "in certain cases, a downward departure may be appropriate to accomplish a specific treatment purpose." USSG § 5C1.1, n. 7.

As the PSR states, OSCAR has a history of hearing voices, anxiety, depression, self-harm, racing thoughts, and suicidal ideation. (PSR at 204-209). OSCAR's mother, who is schizophrenic, reported to pretrial services that OSCAR had been diagnosed with schizophrenia in 2014, which was also reported by OSCAR

himself.[2] The medical records requested from Illinois do not contain any mental health records. It appears that OSCAR has never been screened to determine a mental health diagnosis, and so his treatment needs are currently unknown, and as such, unmet. According to the staff at Jerome Combs Detention Center, because OSCAR could not complete his thoughts during their interactions with him, they have not completed an assessment of him there. (PSR at 207). However, their records reflect "thoughts of depression, sadness and hopelessness, and racing thoughts…hearing voices on occasion." (PSR at 207).

Given the magnitude of OSCAR's mental health difficulties, it is a condition that is "present to an unusual degree" and that "distinguish[es] the case from the typical cases covered by the guidelines."

There is a growing recognition that prisons are not a solution for defendants with mentally illness, that prisons are not the most effective place for treatment, and that both the defendant and the public are better served by treatment alternatives. "Prison is not an appropriate setting for mentally ill defendants to receive treatment, as such individuals may be more vulnerable to difficult living conditions and abuse from other prisoners. Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 56, 59 (2003). This is because, "[f]or mentally disordered prisoners, danger lurks everywhere":

> "They tend to have great difficulty coping with the prison code—either they are intimidated by staff into snitching or they are manipulated by other prisoners into doing things that get them into deep trouble.... [M]ale and female mentally disordered prisoners are disproportionately represented

---

[2] The undersigned believes this diagnosis occurred in Texas, however she could not locate a hospital in the area where OSCAR lived that would have provided him with treatment.

among the victims of rape. Many voluntarily isolate themselves in their cells in order to avoid trouble. Prisoners who are clearly psychotic and chronically disturbed are called 'dings' and 'bugs' by other prisoners, and victimized. Their anti-psychotic medications slow their reaction times, which makes them more vulnerable to 'blind-siding,' an attack from the side or from behind by another prisoner."

*Id*. at 56-57 (quoting Terry Kupers, *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It*, 20 (1999)). Providing comprehensive, effective treatment for those mentally ill defendants whose disorder drives their criminality will more likely protect the public from suffering future crime—and that treatment does not come from incarceration.

Unfortunately, "in addition to their often-untreated illness, mentally ill prisoners are more likely than other prisoners to incur disciplinary infractions and suffer punishment as a result." National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 223 (Jeremy Travis et al. eds., 2014), http://nap.edu/catalog.php?record_id=18613, citing numerous studies. In a committee hearing, Inspector General Michael Horowitz expressed concern "that confining inmates with mental illness in restrictive housing units (RHUs) could have a negative impact on mental health of the inmates and inhibit their ability to successfully reintegrate into society. Research shows that time spent in solitary confinement contributes to elevated rates of recidivism and that many inmates released into the community from RHUs, which can be functionally equivalent to solitary confinement, come out of these units disabled and ill-equipped to reintegrate into the community." Oversight of the Bureau of Prisons and Inmate Reentry, Hearing Before the Committee on Oversight and Gov't

Reform, House of Rep. (Dec 13, 2017) (statement of Michael E. Horowitz, Insp. Gen'l, U.S. Dep't of Justice), https://oig.justice.gov/testimony/t180619.pdf (Last visited May 20, 2019)

Most problematic, however is a finding by The Marshall Project, that although the Bureau of Prisons instituted new policies to better care for inmates with mental illness, the practical effect of this policy has led to inmates with mental health issues receiving less treatment than before the police was enacted. The Marshall Project, *Treatment Denied: The Mental Health Crisis in Federal Prisons* (2018), https://www.themarshallproject.org/2018/11/21/treatmentdenied-the-mental-health-crisis-in-federal-prisons (Last visited May 20, 2019). This is because, "although the Bureau of Prisons changed its rules, officials did not add the resources needed to implement them, creating an incentive for employees to downgrade inmates to lower care levels." *Id.*

It is clear from what evidence has been presented in the PSR that OSCAR, at the bare minimum, needs real mental health screening to determine what kind of care he needs. Despite his documented mental health issues, he has yet to be adequately treated for them while in custody, and OSCAR must receive proper mental health treatment before he has any hope of reentering society successfully.

### III. CONCLUSION

OSCAR should receive a below-guideline sentence at the statutory minimum. Although OSCAR has struggled with mental illness and addiction for most of his life, his almost three years of incarceration have caused him to reflect on how his search for love and belonging led

him to choosing the wrong people to surround himself with, and as a result, he has lost his chance to be around the ones he loves the most—his daughter and family. While in custody, OSCAR has taken every opportunity to rehabilitate himself. He completed a substance abuse treatment program and developed a treatment plan that includes avoiding people and places associated with his addiction and criminal activity. He has been sober for over two years. More importantly, OSCAR has a family support system to keep him on the road to recovery and away from criminal activity.

 Each of these factors are components of a successful treatment plan that will not only help keep him healthy and sober, but also reduce his risk for recidivism. A lengthy prison sentence will undo most of the factors that lower OSCAR's risk for recidivism. A sentence at the statutory minimum will allow OSCAR to reunite with his daughter before she finishes high school, and when she will need him the most. It would also allow OSCAR to reenter society at an age (37) when he could still work and put into practice the skills he is learning while in custody. Furthermore, OSCAR needs real treatment for his mental health issues, and the most effective treatment and rehabilitation will be in the community.

WHEREFORE, for the foregoing reasons, OSCAR respectfully requests a sentence at the statutory minimum, a recommendation he receive a full 12-month placement in a half-way house, and a period of supervision that includes mental health treatment, and continued educational and vocational training.

Respectfully submitted,

/s/Quinn A. Michaelis

Quinn A. Michaelis
Attorney For OSCAR ORTIZ
73 W. Monroe, Suite 106
Chicago, Illinois 60601
312-714-6920

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2019, I electronically filed the above

**SENTENCING MEMORANDUM OF OSCAR ORTIZ**

with the Clerk of Court using the CM/ECF system to all listed parties in the case.

Respectfully Submitted on May 26, 2019.

By His Attorney,

s/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney For OSCAR ORTIZ
73 W. Monroe, Suite 106
Chicago, Illinois 60601
312-714-6920