IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | |
| ) | 16 CR 462-8 |
| v. ) | Honorable Rebecca R. Pallmeyer |
| ) | |
| OSCAR ORTIZ, ) | |
|     Defendant. ) | |

## DEFENDANT'S OBJECTION TO THE PRESENTENCE REPORT

Defendant OSCAR ORTIZ, by and through his attorney, Quinn A. Michaelis, respectfully makes the following objections to the guideline calculations contained in the PSR.

**I.    OFFENSE LEVEL CALCULATIONS:**

    **a.  Objection to offense level calculation for Group 7: Arson of Imperial Gangster's Vehicle (July 12, 2014)**

According to the PSR, the base offense level for this offense is contained in U.S.S.G. § 2K1.4(a)(2), which states that the base offense level for arson is 20 because the offense created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and/or involved the destruction or attempted destruction, or endangerment of a structure. (PSR at 125). The PSR fails to provide details sufficient to determine how the arson of the Imperial Gangster's vehicle fits within this particular guideline.

First and foremost, the vehicle itself does not qualify as a "structure,"

1

pursuant to *Solorzano-Patlan v. INS*, 207 F.3d 869, 874-75 (7th Cir. 2000), which adopted the generic definition of "structure" as "an edifice or building of any kind" and held that a motor-vehicle is not a structure.

Second, neither the PSR, nor the government has offered any evidence that the arson of the vehicle created a substantial risk of bodily harm, and in a review of the case law in this circuit on this point, the enhancement is usually given when a building or home is the subject of arson, not a vehicle. *See United States v. Guadagno*, 970 F.2d 214, (7th Cir. 1992)(applying the enhancement where defendant burned down his grocery store, causing 27 firefighters to respond, and caused the wall of the store to explode onto the street), *United States v. Beyer,* 106 F. 3d 175 (7th Cir. 1997) (applying enhancement where defendant burned his own commercial building containing 7 business in the heart of an urban city, and the fire could not be extinguished for two days because of the amount of accelerant used to ignite the building.), *United States v. Zaragoza*, 117 F. 3d 342 (7th Cir. 1997)(Enhancement applied to defendant who burned down his car dealership by dousing the commercial building and vehicles on the lot with 35 gallons of gasoline, in an urban area), *United States v. Willey*, 985 F. 2d 1342 (7th Cir. 1993) (Enhancement given to defendant who burned down his main competitor's restaurant), *United States v. Fourtis,* 966 F. 2d 1158 (7th Cir. 1992), (applying the enhancement to defendant who attempted to burn down his tavern, located in a building with adjoining hardware store and apartments over a beauty shop adjoining the hardware store.), *United States v. Bader*, 956 F.2d 708 (7th Cir.

1992)(Enhancement applied to defendant who affixed pipe bombs to a home while the residents were at home), *United States v. Martin* (enhancement appropriate for defendant who affixed pipe bomb to residence's back door, knowing the homeowner was home).

According to the government's version of the offense, On July 21, 2014, OSCAR sent a text message to other gang members directing them to meet him later that night for the purpose of burning a rival gang member's car, located at 17th and Main Street in Melrose Park. According to government's exhibit 10, CS-1 was ordered by David Perez ("Monster") to burn the rival gang member's vehicle as it was parked outside of that rival member's house. (Ex 10, Tr. At 52). CS-1 and other defendants arrived at that location and set fire to the vehicle, while other gang members drove around the neighborhood to make sure that these members of the Latin Kings were not seen. (Gov. Ex 10, Tr. at 53-54). It appears from this testimony that the gang members made a specific choice to burn the empty vehicle, as opposed to the rival gang member's home, thereby minimizing the risk caused by the fire. Secondly, other members of the gang drove around the neighborhood to ensure that no other rival gang members were out in the neighborhood, and to ensure that the vehicle burning could occur without anyone else being around the vehicle to discover what was happening. The attempt to set fire to the vehicle without discovery thereby additionally minimized the risk of serious bodily harm caused by the fire.

Accordingly, the proper guideline to apply to group 7 is found in U.S.S.G.

§2K1.4(a)(4), which instructs to add 2 levels to the offense level under §2B1.1. Under §2B1.1, the base offense level is 6. Adding to 2 levels pursuant to §2K1.4(a)(4) results in a base offense level of 8. If the Court finds that OSCAR qualifies for an adjustment for his role in this offense, his resulting adjusted offense level would be 11.

### b. Objections to the Role in the Offense Adjustments

Guideline § 3B1.1(b) provides a three-level enhancement"[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants, or was otherwise extensive." An aggravating role enhancement under Section 3B1.1 is intended for those defendants whose "relative responsibility" for the offense is found to have been greater than that of its other participants. *United States v. Skinner*, 986 F.2d 1091, 1097 (7th Cir. 1993). In determining relative responsibility, the commentary to § 3B1.1 provides that sentencing courts should consider the following seven factors in analyzing whether a defendant qualifies for the role increase:

(1) the exercise of decision-making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n.4.

Evidence that the defendant exercised control over another participant, however, has generally been considered to be the "*sine qua non*" for applying an

4

increase under § 3B1.1. *United States v. Gonzalez-Mendoza*, 584 F.3d 726, 729 (7th Cir. 2009).

The PSR appears to apply this managerial role adjustment to OSCAR simply because of the title he held in the gang, and not because of any specific conduct with respect to each offense for which the role enhancement is applied. Furthermore, because the enhancement is applied in the PSR to each specific offense, the role OSCAR played in each offense should be the determining factor in whether the particular enhancement applies for any given offense calculation.

### i. Group 2: Attempted Murder Victim 1 (May 11, 2014).

According to the PSR, OSCAR first attempted to murder Victim 1 on May 9, 2017, when OSCAR attempted to run Victim 1 over with his car. (PSR at 74). However, According to a proffer summary disclosed to the defense on June 6, 2018, Defendant told the government that it was actually Victim 1 who shot at OSCAR and his companion and attempted to run both of them over with his vehicle.

According to Defendant A, David Perez ordered an individual named "FRE" to shoot Victim 1 on mother's day. The actual order to shoot Sneaky came from another gang member named "Koke" who was the chief enforcer at the time of this shooting, contrary to the PSR's description of OSCAR as chief enforcer at the time (PSR at 78) According to the PSR, the order to shoot Victim 1 did not come down from Nene until May 10, 2019, and there is no evidence that OSCAR was present at the bar where the shoot on sight order was decreed. According to the statement of

5

Defendant B, it appears that OSCAR and another individual came to the bar to tell the gang that Victim 1 had shot at them, and then left the bar to look for Victim 1. Even if OSCAR was present at Bobby's bar when the shoot on sight order was given, according to Defendant B, the chief enforcer of the gang at this time was "Koke." It was at this point, after OSCAR was no longer at the bar, that "Monster"(David Perez) told the other gang members present to shoot or beat up Victim 1 if they saw him. According to the PSR, victim 1 was then seen the next day, but OSCAR was not with the gang members who were present for the shooting. Furthermore, after the shooting, according to Defendant B, Efrain Medina ("Bowser") specifically gave the signal to Dre to shoot Victim 1.

It is clear from multiple statements of other defendants cooperating with the government, that OSCAR was not the individual who directed the other gang members to shoot Victim 1, nor was he even present when the shooting occurred. Furthermore, according to Defendant B, OSCAR was not present when the shooting order was given, and even if he had been, according to Defendant B, the only person with authority to issue a shoot on sight order was the Inca of the gang.

### ii. Group 3: Conspiracy to Commit Murder of Rival Gang Members (July 5, and July 6, 2014) (PSR at 83)

The PSR enhanced the offense level for this group because OSCAR "ordered and encouraged lower members of the gang to participate in [the conspiracy to commit murder.]" (PSR at 90).

According to Defendant B, Efrain Medina ("Bowser"), the younger circle's enforcer, gave the order to shoot black gang members in the

6

neighborhood. According to Defendant B, Efrain Medina ("Bowser") received his orders from Terrorist, who received his orders from David Perez ("Monster").

According to the government's exhibit 10, Efrain Medina ("Bowser") called the CI to tell him that David Perez ("Monster") wanted him to drive other members of the Maywood Latin Kings to shoot members of the Imperial Gangsters. (Gov. Ex 10, Tr. at 31). The CI then went over to Velarde-Saldana ("Chapo")'s house to discuss the shooting planned for that night, along with Efrain Medina ("Bowser"), , Dre, and Velarde-Saldana ("Chapo"). (Tr. at 32). The gang members then discussed who would carry out the shooting, naming a new initiate, Reaper, as the shooter. After seeing Melrose Park police officers in the area, Efrain Medina ("Bowser") called David Perez ("Monster") to question whether they should carry out the shooting in light of the police presence. (Tr. at 34). David Perez ("Monster") left the decision in Terrorist's hands, and Terrorist decided to reschedule the shooting for the following night. (Tr. at 34). The following night, at meeting at which OSCAR was present, David Perez ("Monster") ordered Efrain Medina ("Bowser") and Bad Boy to do the shooting (Tr. at 36) and ordered Scooby and Reaper to do a shooting of a member of the Fullerton and Manheim Chapter of the Latin Kings. (Tr. at 37). The shooting of the rival gang member did not go as planned, and OSCAR was shot by police during the attempted shooting. (Tr. at 39).

As government's Exhibit 10 demonstrates, OSCAR was not present during the initial planning of the shooting of the rival gang member. More importantly, at the second planning meeting, David Perez ("Monster") was the one directing the

7

planning of the shooting, and chose the individuals who would carry out the shootings, not OSCAR. Oscar does not appear to have exercised any authority over the other participants with respect to this shooting. Therefore, the 3-level enhancement should not apply and the appropriate adjusted offense level for group 3 is 33.

### iii. Group 5: Attempted Murder of Gangster Disciple (August 31, 2014)(PSR at 93).

According to the PSR, OSCAR is eligible for a role adjustment because he drove a lower ranked gang member, Velarde-Saldana, to Velarde-Saldana's home so that he could retrieve his firearm. According to Government's Exhibit 18, a recorded conversation between a CHS and members of the gang, Velarde Saldana states

> So I was passin' by and I seen that motherfucker and I was like you bitch ass trick nigga. What's up motherfucker and he's like man fuck you motherfuckin' Kings. I'm like alright motherfucker, be here nigga. So fuckin' I went back around I got the pistol man. I came back around that nigga was right there nigga I fuckin jumped out I was like blah, blah and that motherfuckin' jammed again.

According to Velarde-Saldana's own words directly after the shooting, the decision to shoot at this rival gang member was made after the rival gang member insulted him and the gang. Velardo-Saldana goes on to describe how he made the decision to retrieve his firearm again and to attempt to shoot the rival gang member when the firearm jammed. Not once does Velarde-Saldana mention that OSCAR directed him to shoot the rival gang member, or that OSCAR directed him to retrieve the gun. Velarde-Saldana's own words describe the attempted shooting as

8

something he decided to do seemingly out of a moment of rage, and that his decision to shoot this rival gang member had nothing to do with OSCAR at all.

Accordingly, the 3-level aggravated role enhancement should not apply, and the adjusted offense level for group

      iv.      Group 9: Aggravated Assault of Efrain Medina (August 19, 2014)

According to the PSR, OSCAR is eligible for a role adjustment because he was present with and carried out the beating of Efrain Medina ("Bowser"), and because of his position within the gang. (PSR at 151). Interestingly, OSCAR was also present and participated in the beating of LK C, and was chief enforcer with the Latin Kings at the time, yet he was not assessed the aggravated role enhancement for this beating. The same result should be found for the beating of Efrain Medina.

According to Government's Exhibit 13, after the gang members found Efrain Medina ("Bowser"), David Perez ("Monster") yelled for Efrain Medina ("Bowser") to get into the truck with him, and they drove him to an alley where the rest of the gang members were waiting. Once in the alley, David Perez and Juan Alvarez ("Ghost") separated themselves from the group to decide which type of beating to administer to Medina. Perez and Alvarez argued over the severity of the beating to administer to Medina, and ultimately, they were the ones how the beating would be given.

9

Accordingly, because OSCAR was not involved in the decision about how to administer the beating to Medina, and was merely present, the three-level aggravating role enhancement should not apply.

    c. **Multiple Count Adjustment:**

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 36 | 1.0 |
| Group 2 | 37 | 1.0 |
| Group 3 | 33 | 1.0 |
| Group 4 | 36 | 1.0 |
| Group 5 | 33 | 1.0 |
| Group 6 | 36 | 1.0 |
| Group 7 | 11 | 0.0 |
| Group 8 | 21 | 0.0 |
| Group 9 | 19 | 0.0 |
| Group 10 | 23 | 0.0 |

| | |
|---|---|
| Greater of the adjusted offense levels above: | 37 |
| Increase in offense level: | 5 |
| Combined offense level: | 42 |
| Acceptance of responsibility | -3 |
| Total offense level: | **39** |

## II. CRIMINAL HISTORY CALCULATION

U.S.S.G. § 4A1.3 specifically allows for downward departures if a defendant's criminal history improperly inflates a defendant's guideline range. "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. §4A1.3(b)(1).

Furthermore, under *Rita* and *Kimbrough*, judges may consider arguments that a particular guideline fails to properly reflect §3553(a) considerations, reflects unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita v. United States*, 53 U.S. 338, 351, 357 (2007). Where a guideline was not developed based on "empirical data and national experience," it is not an abuse of discretion to conclude that the particular guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough United States*, 128 S. Ct. 558, 575 (2007).

The United States Sentencing Commission's three reports on recidivism acknowledge that the criminal history rules were never based on empirical evidence.[1] The studies identify numerous factors which predict reduced recidivism that are not included in the Guidelines and factors which do not predict recidivism that are included in the Guidelines.

OSCAR is eligible for a below-guideline sentence under both §4A1.3 and §3553(A). OSCAR's criminal history total is three points, resulting from one city ordinance violation for possession of marijuana paraphernalia in 2014. (PSR at 177-180). Although the ordinance violation only counted for one criminal history point, pursuant to USSG §4A1.1(d), OSCAR receives an additional two points because he was on supervision during the time of the current offense. Thus, for a city ordinance violation in which he received a 6-month sentence of supervision and

---

[1] USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004); USSC, *Recidivism and the First Offender* (May 2004); USSC, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 2005).

a $895 fine, the offense is treated as severely as a felony conviction. This case, for the unlawful possession of marijuana paraphernalia, resulted in no injury to people or damage to property. This single conviction overstates the seriousness of OSCAR's criminal history. *See United States v. Anderson*, 955 F. Supp. 935, 937 (N.D. Ill, 1997) (granting a downward departure where defendant's placement in criminal history category III over represented seriousness of defendant's previous convictions for DUI and domestic battery)

Furthermore, Under U.S.S.G § 4A1.2(c), Sentences Counted and Excluded, local ordinance violations are never counted, unless those violations are also violations of State criminal law. In Will County, possession of paraphernalia is a city ordinance violation, treated civilly with a fine. Bolingbrook Municipal Code §19-1402. Prior to July 29, 2016 possession of marijuana paraphernalia was still criminalized at the state level. However, On July 29, 2016, the possession of marijuana paraphernalia became a civil violation, rather than a criminal violation. (720 ILCS 600/1 et seq.). As such, if OSCAR were to receive the same conviction two years later, his criminal history points would equal zero and he would be in criminal history category I.

As such, OSCAR's criminal history score overrepresents the seriousness of actual Oscar's criminal history, and he should be placed in category I.

## III. CONCLUSION

WHEREFORE, OSCAR ORTIZ respectfully request this Honorable Court find that his that the proper guideline range for count 1 is 262-327 based on a total offense level of 39 and a criminal history category I.

Respectfully submitted,

/s/Quinn A. Michaelis

Quinn A. Michaelis
Attorney For OSCAR ORTIZ
73 W. Monroe, Suite 106
Chicago, Illinois 60601
312-714-6920

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2019, I electronically filed the above

**DEFENDANT'S OBJECTION TO THE PRESENTENCE REPORT**

with the Clerk of Court using the CM/ECF system to all listed parties in the case.

Respectfully Submitted on May 26, 2019.

By His Attorney,

s/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney For OSCAR ORTIZ
73 W. Monroe, Suite 106
Chicago, Illinois 60601
312-714-6920